# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| **EDWARD MILES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **V.** | ) | **Case No. 4:14CV954NCC** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner denying the application of Edward Miles (Plaintiff) for Supplemental Security Income (SSI), under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 et seq. Plaintiff has filed a brief in support of the Complaint. (Doc. 17). Defendant has filed a brief in support of the Answer. (Doc. 23). The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to Title 28 U.S.C. § 636(c). (Doc. 13).

# I.
## PROCEDURAL HISTORY

On September 8, 2009, Plaintiff filed an application for SSI.[1]  (Tr. 99-101).

After his claim was denied initially and by an Administrative Law Judge (ALJ),

and the denial was affirmed by the Appeals Council, Plaintiff filed a Complaint in

the United States District Court for the Eastern District of Missouri.  (Tr. 1-3, 8-16,

46).  By decision, dated September 20, 2013, the District Court remanded the

matter to the Commissioner, with instructions to more fully evaluate Plaintiff's

credibility.  (Tr. 402-404).  On November 5, 2013, the Appeals Council vacated

the final decision of the Commissioner and remanded the case to an ALJ for

further proceedings.  (Tr. 405-407).  Following a second hearing, held on March

12, 2014, an ALJ denied Plaintiff's application.  (Tr. 324-42, 349-71).  As such,

the ALJ's decision stands as the final decision of the Commissioner.

---

[1] Plaintiff also filed applications for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401 et seq., in September 2009, January 2009, October 2006, and June 2004, which applications were denied because Plaintiff did not meet the insured status requirements of Title II on or after his alleged onset dates.  (Tr. 102).  He additionally filed a Title II application, in February 2002, which was denied initially and not pursued further.  (Tr. 102).  Further, Plaintiff filed numerous Title XVI applications, in addition to the application which is the subject of the instant matter.  Plaintiff's other Title XVI applications were all denied initially.  (Tr. 103).  Those claims were not reopened, and the ALJ considered Plaintiff's claim as beginning September 8, 2009, the protective filing date of the application under review.  (Tr. 342).  Plaintiff does not take issue with the ALJ's doing so.  (Doc. 17).

## II.
## LEGAL STANDARDS

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities." Id. "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001) (citing Nguyen v. Chater, 75 F.3d 429, 430-31 (8th Cir. 1996)).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R.

§§ 416.920(d), 404.1520(d); pt. 404, subpt. P, app. 1.  If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history.  See id.

Fourth, the impairment must prevent the claimant from doing past relevant work.  20 C.F.R. §§ 416.920(f), 404.1520(f).  The burden rests with the claimant at this fourth step to establish his or her Residual Functional Capacity (RFC).  See Steed v. Astrue, 524 F.3d 872, 874 n.3 (8th Cir. 2008) ("Through step four of this analysis, the claimant has the burden of showing that she is disabled."); Eichelberger, 390 F.3d at 590-91; Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004); Young v. Apfel, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000).  The ALJ will review a claimant's RFC and the physical and mental demands of the work the claimant has done in the past.  20 C.F.R. § 404.1520(f).

Fifth, the severe impairment must prevent the claimant from doing any other work.  20 C.F.R. §§ 416.920(g), 404.1520(g).  At this fifth step of the sequential analysis, the Commissioner has the burden of production to show evidence of other jobs in the national economy that can be performed by a person with the claimant's RFC.  See Steed, 524 F.3d at 874 n.3; Young, 221 F.3d at 1069 n.5.  If the claimant meets these standards, the ALJ will find the claimant to be disabled.  "The ultimate burden of persuasion to prove disability, however, remains with the claimant."  Id.  See also Harris v. Barnhart, 356 F.3d 926, 931 n.2 (8th Cir. 2004)

(citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)); <u>Stormo v. Barnhart</u>, 377 F.3d 801, 806 (8th Cir. 2004) ("The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."); <u>Charles v. Barnhart</u>, 375 F.3d 777, 782 n.5 (8th Cir. 2004) ("[T]he burden of production shifts to the Commissioner at step five to submit evidence of other work in the national economy that [the claimant] could perform, given her RFC."). Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, the decision must be affirmed if it is supported by substantial evidence. <u>See</u> <u>Clark v. Heckler</u>, 733 F.2d 65, 68 (8th Cir. 1984). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." <u>Krogmeier v. Barnhart</u>, 294 F.3d 1019, 1022 (8th Cir. 2002). <u>See also</u> <u>Cox v. Astrue</u>, 495 F.3d 614, 617 (8th Cir. 2007). In <u>Bland v. Bowen</u>, 861 F.2d 533, 535 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> The concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

<u>See also</u> <u>Lacroix v. Barnhart</u>, 465 F.3d 881, 885 (8th Cir. 2006) ("[W]e may not reverse merely because substantial evidence exists for the opposite decision.")

(quoting Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)); Hartfield v. Barnhart, 384 F.3d 986, 988 (8th Cir. 2004) ("[R]eview of the Commissioner's final decision is deferential.").

It is not the job of the district court to re-weigh the evidence or review the factual record de novo. See Cox, 495 F.3d at 617; Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); McClees v. Shalala, 2 F.3d 301, 302 (8th Cir. 1993); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992). Instead, the district court must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. See Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001) (citing McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Weighing the evidence is a function of the ALJ, who is the fact-finder. See Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). See also Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir. 1992) (holding that an ALJ's decision is conclusive upon a reviewing court if it is supported by "substantial evidence"). Thus, an administrative decision which is supported by substantial evidence is not subject to reversal merely because substantial evidence may also support an opposite conclusion or because the reviewing court would have decided differently. See Krogmeier, 294 F.3d at 1022. See also Eichelberger, 390 F.3d at 589; Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000)

(quoting Terrell v. Apfel, 147 F.3d 659, 661 (8th Cir. 1998)); Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001).

To determine whether the Commissioner's final decision is supported by substantial evidence, the court is required to review the administrative record as a whole and to consider:

(1) Findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

Brand v. Sec'y of Dep't of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980); Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989).

Additionally, an ALJ's decision must comply "with the relevant legal requirements." Ford v. Astrue, 518 F.3d 979, 981 (8th Cir. 2008).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be

expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A). "While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). When evaluating evidence of pain, the ALJ must consider:

> (1) the claimant's daily activities;

> (2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;

> (3) any precipitating or aggravating factors;

> (4) the dosage, effectiveness, and side effects of any medication; and

> (5) the claimant's functional restrictions.

Baker v. Sec'y of Health & Human Servs., 955 F.2d. 552, 555 (8th Cir. 1992); Polaski, 739 F.2d at 1322.

The absence of objective medical evidence is just one factor to be considered in evaluating the plaintiff's credibility. See id. The ALJ must also consider the plaintiff's prior work record, observations by third parties and treating and examining doctors, as well as the plaintiff's appearance and demeanor at the hearing. See Polaski, 739 F.2d at 1322; Cruse, 867 F.2d at 1186.

The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him or her to reject the plaintiff's complaints. See Guilliams, 393 F.3d at 801; Masterson, 363 F.3d at 738; Lewis v. Barnhart, 353 F.3d 642, 647 (8th Cir. 2003); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995). It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he or she considered all of the evidence. Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992); Butler v. Sec'y of Health & Human Servs., 850 F.2d 425, 429 (8th Cir. 1988). The ALJ, however, "need not explicitly discuss each Polaski factor." Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004). See also Steed, 524 F.3d at 876 (citing Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000)). The ALJ need only acknowledge and consider those factors. See id. Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence. See Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988); Millbrook v. Heckler, 780 F.2d 1371, 1374 (8th Cir. 1985).

RFC is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a)(1), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b)-(e). The Commissioner must show that a claimant who cannot perform his or her past relevant work can perform other work which exists in the national economy. See Karlix v. Barnhart, 457 F.3d 742,

746 (8th Cir. 2006); Nevland, 204 F.3d at 857 (citing McCoy v. Schweiker, 683 F.2d 1138, 1146-47 (8th Cir. 1982) (en banc)).  The Commissioner must first prove that the claimant retains the RFC to perform other kinds of work.  See Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857.  The Commissioner has to prove this by substantial evidence.  Warner v. Heckler, 722 F.2d 428, 431 (8th Cir. 1983).  Second, once the plaintiff's capabilities are established, the Commissioner has the burden of demonstrating that there are jobs available in the national economy that can realistically be performed by someone with the plaintiff's qualifications and capabilities.  See Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857.

To satisfy the Commissioner's burden, the testimony of a vocational expert (VE) may be used.  An ALJ posing a hypothetical to a VE is not required to include all of a plaintiff's limitations, but only those which the ALJ finds credible.  See Goff, 421 F.3d at 794 ("[T]he ALJ properly included only those limitations supported by the record as a whole in the hypothetical."); Rautio, 862 F.2d at 180.  Use of the Medical-Vocational Guidelines is appropriate if the ALJ discredits the plaintiff's subjective complaints of pain for legally sufficient reasons.  See Baker v. Barnhart, 457 F.3d 882, 894-95 (8th Cir. 2006); Carlock v. Sullivan, 902 F.2d 1341, 1343 (8th Cir. 1990); Hutsell v. Sullivan, 892 F.2d 747, 750 (8th Cir. 1989).

# III.
# DISCUSSION

The issue before the court is whether substantial evidence supports the Commissioner's final determination that Plaintiff was not disabled. See Onstead, 962 F.2d at 804. Thus, even if there is substantial evidence that would support a decision opposite to that of the Commissioner, the court must affirm her decision as long as there is substantial evidence in favor of the Commissioner's position. See Cox, 495 F.3d at 617; Krogmeier, 294 F.3d at 1022.

Plaintiff was born in 1957, was fifty-two years old at the time he applied for benefits, and was fifty-six at the time of the second hearing. He completed high school and one year of college. (Tr. 46, 142, 354). Plaintiff testified that he had not worked at all since September 2009 and that he could not work because he "could not function right" and because his "mind [went] blank a lot" due to paranoia and depression. (Tr. 22-23, 355).

The ALJ found Plaintiff had not engaged in substantial gainful activity since September 8, 2009, his application date; Plaintiff had the severe impairments of substance abuse, schizoaffective disorder, hypertension, and degenerative disc disease of the cervical spine; and Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment.

The ALJ found Plaintiff had the RFC to perform medium work,[2] except that: Plaintiff was limited to simple, routine, and repetitive tasks; he was unable to perform tasks requiring more than superficial interaction with the public or coworkers; he was unable to deal with more than occasional change in the routine work setting; he was unable to tolerate concentrated exposure to temperature extremes, humidity, strong odors, fumes, dust, chemicals, or other respiratory irritants; and he was unable to tolerate hazards such as unprotected heights or dangerous moving machinery. The ALJ noted that the VE testified that there was work in the national economy which a person of Plaintiff's age and with his education, work history, and RFC could perform. After independently considering jobs described in the Dictionary of Occupational Titles (DOT), the ALJ found that there was work which Plaintiff could perform, and that, therefore, he was not disabled. (Tr. 324-42).

Plaintiff contends that the ALJ's decision is not supported by substantial evidence because: The ALJ failed to point to "some" medical evidence to support his RFC determination; he "discarded all the medical opinion evidence relevant to Plaintiff's mental health functioning; the ALJ failed to "reconcile [his] opinion with [his] stated observation of medical fact from" Plaintiff's treating physicians;

---

[2] 20 CFR § 416.967(c) defines medium work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work."

the ALJ stated legally insufficient reasons for discounting the opinion of Rolando Larice, M.D., whom Plaintiff saw at the Hopewell Center and the opinion of Leepi Khatiwada, a social worker at the Hopewell Center; the ALJ gave insufficient reasons for discounting the opinion of Robert Cottone, M.D.; the ALJ gave insufficient rational for discounting third party testimony; the ALJ gave improper weight to Plaintiff's Global Assessment of Functioning (GAF) scores; the ALJ's credibility determination was flawed; and the hypothetical which the ALJ posed to the VE failed to capture the concrete consequences of Plaintiff's mental health impairment.  For the following reasons, the court finds that Plaintiff's arguments are without merit and that the ALJ's determination that Plaintiff is not disabled is based on substantial evidence and is consistent with the Regulations and case law.

## A.    Plaintiff's Credibility:

The court will first consider the ALJ's credibility determination and factors relevant to the ALJ's credibility determination.  See Wildman v. Astrue, 596 F.3d 959, 969 (8th Cir. 2010) ("[The plaintiff] fails to recognize that the ALJ's determination regarding her RFC was influenced by his determination that her allegations were not credible.") (citing Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005)); 20 C.F.R. §§ 404.1545, 416.945 (2010).  As set forth more fully above, the ALJ's credibility findings should be affirmed if they are supported by substantial evidence on the record as a whole; a court cannot substitute its

judgment for that of the ALJ.  See Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Hutsell, 892 F.2d at 750; Benskin, 830 F.2d at 882.

To the extent that the ALJ did not specifically cite Polaski, other case law, and/or Regulations relevant to a consideration of Plaintiff's credibility, this is not necessarily a basis to set aside an ALJ's decision where the decision is supported by substantial evidence.  Randolph v. Barnhart, 386 F.3d 835, 842 (8th Cir. 2004); Wheeler v. Apfel, 224 F.3d 891, 895 n.3 (8th Cir. 2000); Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996); Montgomery v. Chater, 69 F.3d 273, 275 (8th Cir. 1995).  Additionally, an ALJ need not methodically discuss each Polaski factor if the factors are acknowledged and examined prior to making a credibility determination; where adequately explained and supported, credibility findings are for the ALJ to make.  See Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000).  See also Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not required to discuss each Polaski factor as long as the analytical framework is recognized and considered."); Strongson, 361 F.3d at 1072; Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996).

In any case, "[t]he credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts."  Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001).  "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [a court] will normally defer to the

ALJ's credibility determination." Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003). See also Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010); Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006). For the following reasons, the court finds that the reasons offered by the ALJ in support of his credibility determination are based on substantial evidence.

First, the ALJ considered Plaintiff's work history. In particular, the ALJ considered that Plaintiff's work history failed to demonstrate a motivation to work in the absence of a disabling impairment. In this regard, the ALJ considered that Plaintiff allegedly began experiencing depressive symptoms in his forties, which would have been in the late 1990s and later; that Plaintiff's work record from age twenty-one (about 1977) to that time did not show consistent work activity; and that this information did not enhance Plaintiff's credibility. (Tr. 331). A long and continuous past work record with no evidence of malingering is a factor supporting credibility of assertions of disabling impairments. See Allen v. Califano, 613 F.2d 139, 147 (6th Cir. 1980). For the same reason, an ALJ may discount a claimant's credibility based upon his poor work record. See Ellis v. Barnhart, 392 F.3d 988, 996 (8th Cir. 2005) (ALJ may properly consider claimant had not worked for several years before filing SSI application); Ownbey v. Shalala, 5 F.3d 342, 344 (8th Cir. 1993). See also Fredrickson v. Barnhart, 359 F.3d 972, 976 (8th Cir. 2004) (ALJ properly found claimant not credible due in part to his sporadic work

record reflecting relatively low earnings and multiple years with no reported earnings); Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). Work history is only factor among many for an ALJ to consider. See Curran-Kicksey v. Barnhart, 315 F.3d 964, 969 (8th Cir. 2003).

Second, the ALJ considered that the objective medical evidence was inconsistent with Plaintiff's claim regarding the severity of his mental condition. (Tr. 331-32). See 20 CFR § 404.1529(c)(2) (agency will consider "objective medical evidence" when evaluating symptoms); Gonzales v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006) (ALJ may find claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary). In regard to Plaintiff's alleged mental impairments, the objective medical evidence established that after being released from prison, Plaintiff was seen at the Hopewell Center, in March 2009, at which time he complained of episodic difficulty with depression. It was noted, on this date, that Plaintiff's speech was coherent; his memory was "moderately acceptable"; and he was oriented. (Tr. 245). On November 10, 2009, Plaintiff was oriented and observant; he had no current indication for harming himself or others; his speech was coherent; and his eye contact was adequate. (Tr. 282). When Plaintiff was seen for treatment of the flu, on February 10, 2010, his speech and psychomotor activity were normal, and his flow of thought was appropriate. (Tr. 281). In March 2010, Ms. Khatiwada noted that Plaintiff had a

normal mood, an appropriate affect, and no signs of hallucinations or delusions. She also reported that Plaintiff was well oriented, but appeared agitated; and he denied any current problems with his current situation and being suicidal, delusional, and paranoid, although he reported experiencing mood swings. (Tr. 280, 284). On June 16, 2010, Plaintiff had normal thought content and realistic insight and judgment about matters discussed with a counselor. He presented with no signs of being a threat to himself or others. (Tr. 319). On November 23, 2010, Ms. Khatiwada reported that Plaintiff's thought content seemed appropriate, and he had no signs of hallucinations, illusions, or depression. (Tr. 317). On December 21, 2010, Ms. Khatiwada reported that Plaintiff had normal speech; his thought content was normal; he had good insight and judgment about matters discussed; and he had no signs of hallucinations, depression, illusions, or delusions. (Tr. 314).

On January 18, 2011, Ms. Khatiwada reported that Plaintiff was cooperative; his judgment/insight was good; his affect and mood were hesitant; his thought content was logical; he had no hallucinations or delusions; he was oriented; his memory was normal; and he presented with normal thought content. (Tr. 311). On February 15, 2011, Dr. Larice reported that Plaintiff's eye contact was good; he was alert and oriented; his behavior was appropriate; his mood was congruent; his thought process was logical; and he had no suicidal or homicidal ideations. (Tr.

310).  On March 3, 2011, Plaintiff was oriented; his affect was normal; he was anxious; he did not exhibit compulsive behavior; he had normal language, was not euphoric, fearful and did not have "flight of ideas; he denied hallucinations and hopelessness; he had no mood swings, obsessive thoughts, or paranoia; he had normal insight, judgment, attention span, and concentration; and he did not have suicidal ideation.  (Tr. 307-308).  On January 30, 2013, it was reported that Plaintiff had no anxiety, depression, or sleep disturbances.  (Tr. 470).  On April 9 and 24, 2013, Plaintiff was oriented and his mood and affect were normal.  (Tr. 567, 587).  On October 15, 2013, when Plaintiff presented in the emergency room for chest pain, he was alert and oriented, calm, cooperative, and had clear speech and normal mood and affect.  (Tr. 492, 498).

Third, the ALJ considered the objective medical evidence relevant to Plaintiff's alleged physical limitations.  See 20 CFR § 404.1529(c)(2); Gonzales, 465 F.3d at 895.  In particular, the ALJ considered Plaintiff's cervical spine degenerative disc disease supported his complaints of neck and shoulder pain, and added to the credibility of those allegations.  (Tr. 332).  The record establishes that, in June 25, 2010, a review of Plaintiff's symptoms showed he was negative for cough, dyspnea, wheezing, chest pain, irregular heart-beat, and for "bone/joint symptoms and muscle weakness."  He was well nourished, his lungs were clear to percussion, and he had normal musculature, no joint deformity or abnormalities,

and normal range of motion (ROM). (Tr. 290-91). On March 3, 2011, physical examination showed Plaintiff was in no acute distress; he had no edema, cyanosis, or clubbing in his extremities; and, although Plaintiff had pain on deep breathing, his lungs were clear to percussion, there was no chest wall tenderness and no cough, and his respiratory effort was normal. (Tr. 306-307).

When Plaintiff presented with neck pain, on January 18, 2013, physical examination showed no abnormalities in regard to Plaintiff's eyes, cardiovascular system and his respiratory system, and, in regard to his "musculoskeletal/extremities," Plaintiff was non-tender and had normal ROM, no edema or calf tenderness, and no arm weakness. It was noted that Plaintiff's blood pressure was elevated but that he had no symptoms related to this condition. Upon discharge Plaintiff was ambulatory, in good condition, and had no respiratory distress. (Tr. 622-24). Also, in regard to Plaintiff's allegations of disabling pain, a review of Plaintiff's systems, on January 30, 2013, showed that he had no vision problems, no eye pain, no hearing loss, no chest pain or discomfort, no heart palpitations, no dyspnea, no cough, no wheezing, no muscle aches, no localized joint pain, no localized joint stiffness, no dizziness, no motor disturbances, and no sensory disturbances. Also, Plaintiff had no hypertension and "[n]o physical disability." (Tr. 469-70). The impression from a January 30, 2013 x-ray of Plaintiff's cervical spine included abnormal straightening with mild kyphosis, early

change of minimal degenerative disc disease at C3-C4 and at C4-C5, and significant degenerative disc disease at C6-C7. A view of Plaintiff's thoracic spine showed moderate thoracic scoliosis. (Tr. 473).

On April 9, 2013, when Plaintiff presented to the emergency room for neck pain, it was noted that he had no symptoms which would justify an MRI; there was no evidence of spinal cord or nerve root compression; Plaintiff denied motor weakness; other than the neck pain, all of Plaintiff's systems were negative; and he was discharged in good condition, unaccompanied by anyone. (Tr. 587-88). X-rays of Plaintiff's right shoulder, taken on April 24, 2013, when Plaintiff presented to the emergency room with upper back and shoulder pain, were normal. (Tr. 569-70). Also, on this date, no abnormalities were noted, upon examination, in regard to Plaintiff's eyes, cardiovascular system, respiratory system, neck, and neurologic system. (Tr. 567). On October 15, 2013, when Plaintiff presented for chest pain, a review of Plaintiff's musculoskeletal system and extremities showed normal ROM, and no pedal edema or calf tenderness, and reviews of his respiratory and cardiovascular systems were normal. (Tr. 498).

On October 4, 2014, Plaintiff's lungs showed no wheezing; his heart rate and rhythm were normal; and he was well developed and in no acute distress. (Tr. 476).

Fourth, the ALJ considered that Plaintiff's allegations regarding his symptoms were "primarily [] general." (Tr. 335). For example, the ALJ noted that Plaintiff stated, in a Function Report – Adult, that he did not "want to go outside" or "talk to people," and that he did not "want to be around people unless [he] [was] going out to take care of business." (Tr. 149-50). The ALJ also considered that, at the hearing, Plaintiff had difficulty expressing the relationship between his "hearing voices" and his being unable to work. (Tr. 335).

Fifth, the court notes that Plaintiff testified at the hearing that he had not seen his mental health provider for a "couple of years," probably since 2011, and that, at the time of the hearing, he was not seeing anybody for a mental health disorder. (Tr. 356). Also, after Plaintiff was seen at the Hopewell Center, in March 2009, he did not return there until November 2009. (Tr. 245, 282). Indeed, the ALJ considered that, although Plaintiff's Medicaid benefits were terminated in the middle of 2012, he sought no mental health treatment after his Medicaid eligibility was restored in 2013.[3] (Tr. 338, 356). A lack of regular treatment for an alleged disabling condition detracts from a claimant's credibility. See Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006) (upholding an ALJ's determination a claimant lacked credibility due in part to "absence of hospitalizations . . ., limited treatment of symptoms, [and] failure to diligently seek medical care"); 20 C.F.R. §

---

[3] The court notes that although Plaintiff sought treatment in January and April 2013, it was for physical pain, not mental health treatment. (Tr. 470, 567, 587).

404.1529(c)(3)(v) (the agency will consider the claimant's treatment when evaluating her symptoms): <u>Roberts v. Apfel</u>, 222 F.3d 466, 469 (8th Cir. 2000) (citing <u>Dixon v. Sullivan</u>, 905 F.2d 237, 238 (8th Cir. 1990)). <u>Eichelberger</u>, 390 F.3d at 589 (holding that the ALJ properly considered that the plaintiff cancelled several physical therapy appointments and that no physician imposed any work-related restrictions on her).

Sixth, Plaintiff testified that he got "short winded"; he had this problem since "at least 2000"; he smoked a half package of cigarettes a day, "maybe"; and he had been trying to stop smoking. (Tr. 360-61). On June 25, 2010, Plaintiff was referred to smoking cessation. (Tr. 291). On June 21, 2011, it was reported that Plaintiff smoked cigarettes. (Tr. 306). Nurse Practitioner Gabrielle Satterfield reported, on January 30, 2013, that Plaintiff said he had "snort[ted] cocaine in the past week, and that Plaintiff was advised to stop using cocaine. (Tr. 469). She also reported, on February 20, 2013, that Plaintiff said he had snorted heroin in the past week. (Tr. 474). On October 15, 2013, it was reported that Plaintiff smoked four to five cigarettes a day and that he used heroin. (Tr. 497). On November 14, 2013, it was again recommended that Plaintiff stop smoking. (Tr. 479). <u>See Wildman v. Astrue</u>, 596 F.3d 959, 968-69 (8th Cir. 2010) (it is permissible for ALJ to consider claimant's non-compliance with prescribed medical treatment).

Seventh, the ALJ considered Plaintiff's daily activities. (Tr. 336). While the undersigned appreciates that a claimant need not be bedridden before [he] can be determined to be disabled, Plaintiff's daily activities can nonetheless be seen as inconsistent with [his] subjective complaints of a disabling impairment and may be considered in judging the credibility of complaints. See Eichelberger, 390 F.3d at 590 (ALJ properly considered that plaintiff watched television, read, drove, and attended church upon concluding that subjective complaints of pain were not credible); Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001). Indeed, the Eighth Circuit holds that allegations of disabling "pain may be discredited by evidence of daily activities inconsistent with such allegations." Davis v. Apfel, 239 F.3d 962, 967 (8th Cir. 2001).

In regard to Plaintiff's daily activities, the ALJ considered that Plaintiff's sister reported, in a November 2009 Function Report – Adult, that she did not let him perform some household chores because she did not like the way he did them or because he was inattentive and she worried about his leaving the stove on. (Tr. 336, 157-60). Notably, Ms. Khatiwada recommended, in November 2010, that Plaintiff "keep himself occupied through television, socialization, church, or helping out [his] sister with things." (Tr. 318). As considered by the ALJ, on January 30, 2013, it was reported that Plaintiff had "no physical disability and [his] activities of daily living were normal." (Tr. 336, 469). Further, Plaintiff testified

that he spent a typical day watching television or listening to music; he tried to sweep and mop; he kept "the front room clean"; he sometimes folded laundry; the only activity he engaged in outside of the house was walking; and when he walked, he walked "around the block, probably to the park around the corner." (Tr. 361-62).

Eighth, the ALJ considered the observations by Social Security employees and others. "[A]n ALJ may disbelieve a claimant's subjective reports of pain because of inconsistencies or other circumstances." Eichelberger, 290 F.3d at 589. In particular, the ALJ considered that a Claims Representative (CR) reported no abnormal observations. (Tr. 336). The court notes that the CR said he did not observe that Plaintiff had difficulty with any of the following, when he met Plaintiff face-to-face: Hearing, reading, breathing, understanding, coherency, concentrating, talking, answering, sitting, standing, walking, seeing, using his hands, and writing. (Tr. 125-26). The ALJ, however, gave the CR's observations little weight because there was no indication that he was a trained medical professional. (Tr. 336).

Ninth, the ALJ considered that Plaintiff's demeanor during the hearing "was consistent with his general allegations regarding his mental impairments," and that this factor enhanced Plaintiff's credibility. (Tr. 336). While an ALJ cannot accept or reject subjective complaints *solely* on the basis of personal observations, see

Ward v. Heckler, 786 F.2d 844, 847-48 (8th Cir. 1986), an ALJ's observations of a claimant's appearance and demeanor during the hearing is a consideration, see Steed v. Astrue, 524 F.3d 872, 876 (8th Cir. 2008) (holding that an ALJ "is in the best position" to assess credibility because he is able to observe a claimant during his testimony); Johnson v. Apfel, 240 F.3d 1145, 1147-48 (8th Cir. 2001) ("The ALJ's personal observations of the claimant's demeanor during the hearing is completely proper in making credibility determinations"); Jones v. Callahan,122 F.3d 1148, 1151 (8th Cir. 1997) ("When an individual's subjective complaints of pain are not fully supported by the medical evidence in the record, the ALJ may not, based solely on his personal observations, reject the complaints as incredible."). Here, to reach his conclusion, the ALJ combined his review of the record as a whole with his personal observations.

Tenth, the ALJ considered that Dr. Larice recommended that Plaintiff pursue vocational training, school, or a job, which recommendation was inconsistent with Plaintiff's allegations regarding the severity of his conditions. (Tr. 310, 336). "Acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility." Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001).

Eleventh, the ALJ noted that, although Plaintiff's lack of medication compliance detracted from his credibility, this factor did not merit great weight.

(Tr. 336-37).  See Wildman v. Astrue, 596 F.3d 959, 964-65 (8th Cir. 2010) (holding that noncompliance is a basis for discrediting a claimant, and noting that when the claimant was compliant with dietary recommendations his pain was under good control).

In regard to Plaintiff's compliance with taking prescribed medication, on June 16, 2010, Plaintiff told a counselor that he did not want to take a particular medication.  (Tr. 319).  As considered by the ALJ, on June 25, 2010, Plaintiff's blood pressure was elevated, but it was reported that he had stopped taking his medications "due to [his] belief he didn't need them."  (Tr. 291).  Significantly, on December 21, 2010, when Plaintiff denied having any "medical condition[s]," he was compliant with taking his medications.  (Tr. 315).  On June 21, 2011, it was noted that Plaintiff "refuse[d] lab work or health maintance [sic]."  (Tr. 306).  On January 18, 2013, Plaintiff had no symptoms related to high blood pressure, even though he was not taking any medications for this condition.  (Tr. 623).  On October 4, 2013, it was reported that Plaintiff had not been taking a prescribed medication; that he never got the prescription filled; and that Plaintiff had a history of medication noncompliance.  (Tr. 476).  On October 5, 2013, when Plaintiff presented to the emergency room for hypertension, he said that he had been out of his hypertension medication for three days and that he could not afford the medication.  Also, Plaintiff refused to have a blood draw on this date, after an

unsuccessful attempt. (Tr. 530, 532, 536). On October 15, 2013, when Plaintiff presented to the emergency room with chest pain, it was reported he was not taking medications at that time. An emergency room summary from this visit states that Plaintiff had been seen about a week prior, at which time he refused a complete work up, although he was currently agreeable to the plan. (Tr. 497, 508). On November 14, 2013, Plaintiff said he could not obtain his blood pressure medication because he did not have any money. (Tr. 478).

The ALJ also considered that, despite Plaintiff's not taking medication from about March 2011 to the date of the hearing, in March 2014, Plaintiff was not hospitalized during this period, and the medical sources interacting with him during this period did not note any psychological issues for which Plaintiff might need treatment. (Tr. 337). Plaintiff, moreover, testified that, on medication, he heard voices "maybe once every two months," and that his medicine got "rid of any hallucinations." (Tr. 24-25). See Renstrom v. Astrue, 680 F.3d 1057, 1066 (8th Cir. 2012) (conditions which can be controlled by treatment are not disabling).

To the extent Plaintiff argues that the ALJ should have relied on a Function Report - Adult provided by Plaintiff's sister when considering the effect of Plaintiff's medication and when considering his medication compliance, the court notes that Plaintiff's sister stated, in the Function Report - Adult, that Plaintiff did

not need help or reminders to take his medicine. (Tr. 159). Thus, the court finds that the third-party function report actually damages Plaintiff's credibility.

Twelfth, the court notes that Plaintiff made statements to medical providers which were inconsistent with his allegations of disabling conditions. For example, on December 21, 2010, when asked about his medical conditions, he told Ms. Khatiwada that he did not have any, although he said he was unable to get "straight sleep." (Tr. 315). See Travis v. Astrue, 477 F.3d 1037, 1042 (8th Cir. 2007) ("An ALJ may not disregard subjective complaints merely because there is no evidence to support the complaints, but may disbelieve subjective reports because of inherent inconsistencies or other circumstances.").

Thirteenth, Ms. Khatiwada recommended, in November 2010, that Plaintiff cut down on the amount of coffee he drank, and that he make attempts to increase his appetite by trying to frequently eat little portions. (Tr. 317). Conservative treatment is consistent with discrediting a claimant's allegation of disabling pain. See Pelkey v. Barnhart, 433 F.3d 575, 579 (8th Cir. 2006) (affirming ALJ's credibility determination based in part on claimant's doctors having recommended exercise and medication but never surgery); Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998).

Fourteenth, the ALJ considered that Plaintiff's self-isolation neither corroborated nor refuted Plaintiff's allegations regarding the severity of his alleged

mental condition. (Tr. 339). Indeed, the record fails to provide medical records relevant to Plaintiff's reporting that he did not want to see people, be around people, go outside, or talk to people. (Tr. 147-51). A claimant's limitation which is self-imposed, rather than a medical necessity, is a basis upon which an ALJ may discredit a claimant's alleged limitation. See Blakeman v. Astrue, 509 F.3d 878, 882 (8th Cir. 2007) ("The issue is not whether [the claimant] was credible in testifying that he naps each weekday afternoon he is not working. The issue is whether his heart condition compels him to nap each afternoon."); Brunston v. Shalala, 945 F. Supp. 198, 202 (W.D. Mo. 1996) ("Plaintiff also testified that she spent part of the day lying down; however, no physician stated that such a need existed. If plaintiff was not lying down out of medical necessity, then that indicates that she was lying down by choice."). Cf. Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) ("We find it significant that no physician who examined Young submitted a medical conclusion that she is disabled and unable to perform any type of work.") (citing Brown v. Chater, 87 F.3d 963, 964-65 (8th Cir. 1996)).

**B.      Weight Given to Opinion of Ms. Khatiwada and Dr. Larice:**

The ALJ considered that the record includes a Mental RFC Questionnaire signed, on January 28, 2011, by Dr. Larice, Plaintiff's treating physician, but completed by Ms. Khatiwada, Plaintiff's case manager at the Hopewell Center. Upon considering the Mental RFC Questionnaire, the ALJ noted that a medical

professional can adopt the content of a form by signing it, even if he or she did not fill it out or write it. The Mental RFC Questionnaire states, among other things, that the signs of Plaintiff's mental condition included appetite disturbance, decreased energy, difficulty concentrating or thinking, paranoid thinking, hallucinations or delusions, motor tension, inflated self-esteem, easy distractibility, sleep disturbances, and loss of intellectual ability of fifteen IQ points or more. It also states that Plaintiff was unable to meet competitive standards for understanding and remembering very short and simple instructions, for carrying out very short and simple instructions, for maintaining regular attendance, for sustaining an ordinary routine without special supervision, for making simple work-related decisions, for performing at a consistent pace, for accepting instructions, for dealing with normal work stress, for being aware of hazards, and for taking appropriate precautions, traveling to unfamiliar places, and using public transportation. Plaintiff had no ability to work in coordination with or proximity to others without being unduly distracted, completing a normal workday without interruptions from psychological based symptoms, carrying out detailed instructions, and adhering to basic standards of neatness and cleanliness. The Mental RFC Questionnaire further states that Plaintiff would be absent, due to his impairments, more than four days a month, and that Plaintiff was a "malingerer." (Tr. 293-98). Plaintiff contends the ALJ erred in giving "no weight" to the

opinions expressed in the January 28, 2011 Mental RFC Questionnaire. For the following reasons, the court finds that the ALJ's determination not to give any weight to the opinions expressed in the Mental RFC Questionnaire and that the ALJ's decision, in this regard, are based on substantial evidence.

First, upon failing to give this Mental RFC Questionnaire controlling weight, the ALJ considered that Ms. Khatiwada assisted Plaintiff in completing this document and that the endorsement of symptoms in the Questionnaire reflected Plaintiff's input more than Ms. Khatiwada's conclusions about his abilities. (Tr. 332-33). See McCoy v. Astrue, 648 F.3d 605, 617 (8th Cir. 2011) (ALJ properly discounted doctor's opinion where evaluation was based, at least in part, on claimant's self-reported symptoms; insofar as claimant's self-reported symptoms were found to be less than credible, doctor's report was rendered less credible); Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007) (holding that the ALJ was entitled to give less weight to the opinion of a treating doctor where the doctor's opinion was based largely on the plaintiff's subjective complaints rather than on objective medical evidence) (citing Vandenboom v. Barnhart, 421 F.3d 745, 749 (8th Cir. 2005)).

Second, the ALJ considered that, on the day the form was completed, January 28, 2011, Plaintiff presented with no significant observed abnormalities, except a "hesitant" mood and affect. Actually, Ms. Khatiwada saw Plaintiff just

ten days earlier, on January 18, 2011. On that date she reported that Plaintiff's judgment/insight was good; his speech was coherent; his affect and mood were hesitant; his thought content was logical; he did not have hallucinations or delusions; he was oriented "x3"; his memory was normal; he had normal content of thought, with no signs of depressions or hallucinations; his eye contact was "good overall"; and he "appeared expressive and respective." (Tr. 311, 333). Also, on December 21, 2010, just a month before the Questionnaire was completed, Ms. Khatiwada reported that Plaintiff was on time, exhibited good insight and judgment about the matters discussed and had no signs or symptoms of hallucinations, depressions, illusions, or delusions; he had no complaints except for sleep disturbance; and he expressed no needs except for a medication refill and getting paperwork for his SSI appeal. The court also notes that Ms. Khatiwada reported, on this date, that when she inquired about Plaintiff's medical conditions, Plaintiff "denied any," and he denied needing any assistance besides wanting to have his paperwork completed and obtain a refill for Valium. (Tr. 333, 314-15). See Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006) (a physician's own inconsistency may diminish or eliminate weight accorded to his opinion). See also Davidson v. Astrue, 578 F.3d 838, 842 (8th Cir. 2009) ("It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes."); Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir.

2006) (holding that an ALJ may give a treating doctor's opinion limited weight if it is inconsistent with the record).

Third, the Mental RFC Questionnaire contained limitations which were inconsistent with Plaintiff's historical functioning, in particular, his consistently normal presentation, with generally appropriate hygiene, consistent timeliness, and consistent socially appropriate behavior. (Tr. 333).

Fourth, the Mental RFC Questionnaire contained inconsistencies, such as stating that Plaintiff had a decrease in IQ points and had difficulty following instructions because of his reasoning power, but also stating that Plaintiff was capable of managing his own benefits and that Plaintiff was a malingerer. (Tr. 333). See Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006) (ALJ may elect not to give controlling weight to treating doctor's opinion, as the record must be evaluated as a whole; treating physician's own inconsistency may diminish or eliminate weight accorded to his opinion).

Fifth, the ALJ considered that, on February 15, 2011, approximately two weeks after the Mental RFC Questionnaire was completed, Plaintiff saw Dr. Larice, and Dr. Larice reported that he saw no evidence of delusion or hallucination, and suggested that Plaintiff try vocational training, going to school, or getting a job. Dr. Larice also reported that Plaintiff had no observable abnormalities on a mental status examination; his eye contact was good; he was

alert and oriented; his behavior was appropriate; his mood was congruent; his affect was euthymic; his thought process was logical; his thought content was normal; his insight was good; and his judgment was fair. (Tr. 333, 310). See Davidson, 578 F.3d at 842.

Sixth, to the extent Dr. Larice and Ms. Khatiwada opined that Plaintiff was disabled for purposes of Social Security, it is the ALJ's role to determine whether a claimant is disabled within the meaning of the Act. See Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012) (a doctor's finding that the claimant was totally disabled "[got] no deference because it invade[d] the province of the Commissioner to make the ultimate disability determination."); Ward v. Heckler, 786 F.2d 844, 846 (8th Cir. 1986) (per curiam) ("Even statements made by a claimant's treating physician regarding the existence of a disability have been held to be properly discounted in favor of the contrary medical opinion of a consulting physician where the treating physician's statements were conclusory in nature.").

Seventh, the ALJ identified good reasons for not giving any weight to the opinions expressed in the Mental RFC Questionnaire completed by Ms. Khatiwada and Dr. Larice. See Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991); King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984) (holding that the ALJ is not bound by conclusory statements of total disability by a treating physician where the ALJ has identified good reason for not accepting the treating physician's opinion, such

as its not being supported by any detailed, clinical, or diagnostic evidence).  See also SSR 96-2p 1996 WL 374188 (July 2, 1996) (clarifying that 20 C.F.R. §§ 404.1527 and 416.927 require that ALJ to provide "good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s)").

In conclusion, the court finds that the ALJ gave sufficient reasons for discounting the opinions of Ms. Khatiwada and Dr. Larice as expressed in the January 28, 2011 Mental RFC Questionnaire, and that the ALJ's decision, in this regard, is based on substantial evidence.

## C.    Plaintiff's GAF Scores:

GAF is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations.  See Diagnostic and Statistical Manual of Mental Disorders, DSM-IV, 30-32 (4th ed. 1994).  Expressed in terms of degree of severity of symptoms or functional impairment, GAF scores of 31 to 40 represent "some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood," 41 to 50 represents "serious," scores of 51 to 60 represent "moderate," scores of 61 to 70 represent "mild," and scores of 90 or higher represent absent or minimal symptoms of impairment.  Id. at 32.  See also Brown v. Astrue, 611 F.3d 941, 955 (8th Cir.

2010) ("[A] GAF score of 65 [or 70] . . . reflects 'some mild symptoms (e.g. depressed mood or mild insomnia) OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships.'") (quoting <u>Kohler v. Astrue</u>, 546 F.3d 260, 263 (2d Cir. 2008) (quoting Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) (alterations in original).

The ALJ, in the matter under consideration, considered that Plaintiff was primarily assigned GAF scores of 45 at the Hopewell Center, and that the consultative examiner assigned a GAF score of 70. The ALJ considered the significance of scores between 41 and 50 indicating serious symptoms and of scores ranging from 61 to 70 indicating some mild symptoms, and concluded that the assigned scores of 45 were not consistent with Plaintiff's level of demonstrated functioning. In particular, the ALJ considered that Plaintiff's primary complaint during treatment at the Hopewell Center was an inability to sleep; that his symptoms were reportedly controlled or reduced with medication; and that Plaintiff did not exhibit abnormalities consistent with scores of 45. The ALJ, therefore, gave "little weight" to the implied opinion represented by Plaintiff's GAF scores of 45. (Tr. 334). For the following reasons, the court finds that the ALJ gave proper weight to Plaintiff's GAF scores.

Where a treating source assigns a GAF which is inconsistent with the source's treatment notes, an ALJ properly declines to give the GAF scores controlling weight.  See Jones v. Astrue, 619 F.3d 963, 974 (8th Cir. 2010); Grim v. Colvin, 2014 WL 859840, at *7-8 (E.D. Mo. Mar. 5, 2014) (unpublished) (ALJ properly found claimant's mental impairments were not serious despite the presence of GAF scores that reflected moderate or serious symptoms).  See also Juszczyk v. Astrue, 542 F.3d 626, 632-33 (8th Cir. 2008) (holding the ALJ's decision not to rely on the treating physician's GAF assessment was supported by substantial evidence where the assessment was extreme in light of the contradictory medical evidence); Goff, 421 F.3d at 791 (noting the ALJ was not compelled to give controlling weight to the physician's opinion where the GAF assessment of 58 was inconsistent with the physician's opinion that the claimant suffered from extreme limitations); Hudson ex rel. Jones v. Barnhart, 345 F.3d 661, 666-67 (8th Cir. 2003) (concluding the ALJ's decision that the GAF ratings did not appear to reflect the claimant's abilities was supported by the record).

Further, while a GAF score may be helpful in assisting an ALJ's formulating a determination, it "is not essential to the RFC's accuracy." Howard v. Comm'r of Soc. Sec., 276 F.3d 235, 241 (6th Cir. 2002).  Additionally, the Regulations note that the GAF scale does not have a direct correlation to the severity requirements in the mental disorders listings.  65 F.R.D. 50746-01, 50764-65, 2000 WL

1173632 (Aug. 21, 2000). As such, the court finds that the ALJ's consideration of Plaintiff's GAF scores from the Hopewell Center is consistent with the Regulations and case law and that it is based on substantial evidence

The ALJ gave no weight to the GAF score of the consultative examiner, Georgia Jones, M.D., who, after conducting a psychiatric examination of Plaintiff, reported that he had a GAF of 70. The ALJ's reason for giving little weight to Dr. Jones's opinion was that her report indicated the "potential for an implied negative personal feeling toward" Plaintiff. Upon reaching this conclusion, the ALJ considered that Dr. Jones stated that she felt Plaintiff was "exaggerating his symptoms," "was playing with [her] trying to read [her] and give [her] the answers [she] wanted about his psychiatric symptoms," and that he "had an agenda." (Tr. 334, 250). While the court notes that Dr. Jones's GAF assessment was inconsistent with the record as a whole, an examining physician expression of doubt about the validity of a claimant's complaints is a factor which discounts the claimant's credibility. See Baker v. Barnhart, 457 F.3d 882, 892-93 (8th Cir. 2006) (holding that the ALJ properly discounted the claimant's complaints of pain upon considering reports that the claimant exaggerated his symptoms during an examination); Clay v. Barnhart, 417 F.3d 922, 930 n.2 (8th Cir. 2005) (noting that two psychologists' findings that the claimant was "malingering" on her IQ tests cast suspicion on the claimant's motivations and credibility); Jones v. Callahan, 122

F.3d 1148, 1151-52 (8th Cir. 1997) (holding that a physician's observation "of the discrepancies in [the claimant's] appearance in the examining room and those outside when he did not know that he was observed" supported an ALJ's finding that the claimant's complaints were not fully credible). See also Russell v. Sec'y of Health, Ed. and Welfare, 540 F.2d 353, 357 (8th Cir. 1976) (holding that where doctors reported that the claimant was exaggerating her ailments and was uncooperative, the record did not establish the requisite degree of certainty that the claimant was disabled). Nonetheless, the court finds that the ALJ's decision not to give any weight to the GAF score Dr. Jones assigned to Plaintiff is based on substantial evidence and that it is consistent with the Regulations and case law.

## C.    Opinion of Dr. Cottone:

Plaintiff contends that the ALJ failed to give a proper explanation for discounting the opinion of Dr. Cottone, the State agency non-examining psychological consultant. Dr. Cottone completed a Psychiatric Review Technique Form and a Mental RFC Assessment, on January 20, 2010, and opined that Plaintiff had mild limitations in restriction of activities of daily living; he had moderate restrictions in maintaining social functioning, and concentration, persistence or pace; and he was not significantly limited in the ability to remember locations and work-like procedures, to understand and remember very short and simple instructions, to carry out very short and simple instructions, to make simple

work-related decisions; to ask simple questions or request assistance, to respond appropriately to changes in the work setting; and to be aware of normal hazards and take appropriate precautions. Plaintiff was moderately limited in regard to the ability to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, to sustain an ordinary routine without special supervision, to work in coordination with or proximity to others without being distracted, to complete a normal workday without interruptions, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers, to maintain socially appropriate behavior and to adhere to basic standards of neatness, and to use public transportation. Dr. Cottone concluded that the "totality of the medical evidence indicate[d] that [Plaintiff] [could] do simple work, with restrictions on his social contact and avoidance of work proximal to available controlled substances." (Tr. 254-68).

The ALJ gave no weight to Dr. Cottone's opinion because it was "internally inconsistent"; Dr. Cottone, for example, opined that Plaintiff had a moderate limitation in the ability to complete a normal workday, but he failed to account for this limitations in his RFC assessment. (Tr. 262-68). An ALJ need not afford a doctor's opinion controlling weight where it is internally inconsistent. See Myers

v. Colvin, 721 F.3d 521, 525 (8th Cir. 2013). Cf. Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006) (holding that where a treating physician's notes are inconsistent with his or her RFC assessment, controlling weight is not given to the RFC assessment). The court finds that the ALJ gave sufficient reason for his determination not to give Dr. Cottone's opinion any weight, see SSR 96-2p, 1996 WL 37188, at *3 (July 2, 1996) (clarifying that 20 C.F.R. §§ 404.1527 and 416.927 require that the ALJ provide "good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s)"), and that the ALJ's decision, in this regard, is based on substantial evidence and consistent with the Regulations and case law.

## D.     Function Report – Adult – Third Party:

Plaintiff contends that the ALJ failed to give proper weight to the Function Report – Adult provided by Plaintiff's sister. (Tr. 156-65). The court has discussed above, in regard to Plaintiff's credibility, the contents of this report, and has found above, that the report actually discredited Plaintiff's claims regarding the severity of his symptoms, as his sister stated that Plaintiff did not require reminders to take nor help with his medications. As considered by the ALJ, Plaintiff's sister did not explain the underlying causes of Plaintiff's alleged limitations of daily activities. Further, there is no evidence of record to support some of the limitations described by Plaintiff's sister. For example, although Plaintiff's sister reported that

Plaintiff could not lift "anything heavy" because there was "something wrong with his knees," she did not state what was wrong with Plaintiff's knees. (Tr. 162). See Black v. Apfel, 143 F.3d 383, 387 (8th Cir. 2006) (holding that an ALJ may discount corroborating testimony on the same basis used to discredit a claimant's testimony). In conclusion, the court finds that the ALJ gave proper weight to the Function Report – Adult completed by Plaintiff's sister and that the ALJ's decision, in this regard, is based on substantial evidence and consistent with the Regulations and case law.

**E.    Plaintiff's RFC:**

As set forth above, the ALJ found Plaintiff had the RFC to perform medium work, except that: Plaintiff was limited to simple, routine, and repetitive tasks; he was unable to perform tasks requiring more than superficial interaction with the public or coworkers; he was unable to deal with more than occasional change in the routine work setting; he was unable to tolerate concentrated exposure to temperature extremes, humidity, strong odors, fumes, dust, chemicals, or other respiratory irritants; and he was unable to tolerate hazards such as unprotected heights or dangerous moving machinery.

The Regulations define RFC as "what [the claimant] can do" despite his or her "physical or mental limitations." 20 C.F.R. § 404.1545(a). "When determining whether a claimant can engage in substantial employment, an ALJ must consider

the combination of the claimant's mental and physical impairments." Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001). "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). See also Myers v. Colvin, 721 F.3d 521, 526 (8th Cir. 2013).

As required by the Regulations and case law, upon determining Plaintiff's RFC, the ALJ moved analytically, from ascertaining the true extent of Plaintiff's impairments to determining the kind of work he could still do despite his impairments. In this regard, as discussed in detail above, the ALJ considered factors relevant to Plaintiff's credibility, including the objective medical evidence. See Lauer, 245 F.3d at 704 (holding that although assessing a claimant's RFC is primarily the responsibility of the ALJ, a "'claimant's residual functional capacity is a medical question'") (quoting Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000)). The ALJ specifically considered that Plaintiff's hypertension, when not medicated, caused occasional dizziness and headaches, and noted the medical evidence relevant to Plaintiff's hypertension by including a limitation in Plaintiff's RFC that he not be exposed to respiratory irritants or to workplace hazards, such as unprotected heights. (Tr. 340, 474, 490, 535). As for Plaintiff's symptoms related

to degenerative disc disease, the ALJ limited Plaintiff to work at the medium level of exertion.  (Tr. 339, 473).  As for Plaintiff's mental condition, the ALJ limited Plaintiff to simple, routine, and repetitive tasks, to performing tasks requiring more than superficial interaction with the public or coworkers, and to dealing with no more than occasional change in the routine work setting.  See Lauer, 245 F.3d at 704 ("'Some medical evidence,' Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam), must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace,' Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).").  See also Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010) ("The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC."); Eichelberger, 390 F.3d at 591.

The ALJ also considered that the evidence did not warrant further environmental restrictions, given that Plaintiff smoked cigarettes throughout the relevant period without triggering any exacerbations of his symptoms.  (Tr. 340, 360-61).

The ALJ did not include restrictions in Plaintiff's RFC to accommodate Plaintiff's alleged grasping problems, as the ALJ found there was no credible record evidence to support such a claim.  (Tr. 340, 357-580).  See Tindell v.

Barnhart, 444 F.3d 1002, 1007 (8th Cir. 2006) ("The ALJ included all of Tindell's credible limitations in his RFC assessment, and the ALJ's conclusions are supported by substantial evidence in the record.").

Indeed, the court finds that the ALJ's RFC assessment is precise as it directly addresses Plaintiff's restrictions and that it is based upon and is consistent with all of the relevant evidence. See McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000) ("The Commissioner must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.") (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)).

To the extent Plaintiff contends that the ALJ's decision is not supported by substantial evidence because it does not completely mirror the opinion of a particular medical source such as Dr. Larice, upon formulating a claimant's RFC, the "ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions of any of the claimant's physician's." Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011).

In conclusion, the court finds that the ALJ sufficiently cited medical evidence to support his RFC determination; that he considered the medical opinion evidence relevant to Plaintiff's mental health functioning; and that he reconciled his opinion with medical facts reported by Plaintiff's physicians.

Further, the court finds that the ALJ's RFC determination is based on substantial evidence and is consistent with the requirements of the Regulations and case law.

After determining Plaintiff's RFC, the ALJ submitted a hypothetical to a VE which described a person of Plaintiff's age and with his RFC, education, and work history, and the VE testified that the hypothetical person was capable of performing jobs which existed in significant numbers in the national economy. (Tr. 367-68). To the extent Plaintiff suggests the ALJ failed to include limitations beyond those encompassed in the RFC determined by the ALJ, the ALJ was not required to include these additional limitations in the hypothetical. See Renstrom v. Astrue, 680 F.3d 1057, 1067 (8th Cir. 2012); Martise v. Astrue, 641 F.3d 909, 927(8th Cir. 2011) ("The ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole.") (quoting Lacroix v. Barnhart, 465 F.3d 881, 889 (8th Cir. 2006)); Wildman v. Astrue, 596 F.3d 959, 969 (8th Cir. 2010) ("[T]he ALJ was not obligated to include limitations from opinions he properly disregarded."); Guilliams v. Barnhart, 393 F.3d 789, 804 (8th Cir. 2005) (holding that a proper hypothetical sets forth impairments supported by substantial evidence and accepted as true by the ALJ).

Indeed, a hypothetical is sufficient if it sets forth the impairments which are accepted as true by the ALJ. Haggard v. Apfel, 175 F.3d 591, 595 (8th Cir. 1999)

(holding that the ALJ need not include additional complaints in the hypothetical not supported by substantial evidence). Moreover, where a hypothetical question precisely sets forth all of a claimant's physical and mental impairments, a VE's testimony constitutes substantial evidence supporting the ALJ's decision. Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011) ("Based on our previous conclusion . . . that 'the ALJ's findings of [the claimant's] RFC are supported by substantial evidence,' we hold that '[t]he hypothetical question was therefore proper, and the VE's answer constituted substantial evidence supporting the Commissioner's denial of benefits.'") (quoting Lacroix v. Barnhart, 465 F.3d 881, 889 (8th Cir. 2006)); Robson v. Astrue, 526 F.3d 389, 392 (8th Cir. 2008) (holding that a VE's testimony is substantial evidence when it is based on an accurately phrased hypothetical capturing the concrete consequences of a claimant's limitations); Wingert v. Bowen, 894 F.2d 296, 298 (8th Cir. 1990).

Significantly, the ALJ in this matter considered the DOT independently of the VE's testimony, and determined that the DOT provided that there was work which Plaintiff could perform. (Tr. 341-42). Cf. Kemp v. Colvin, 765 F.3d 926, 930 (8th Cir. 2014) (remanding denial of benefits because "the record does not reflect whether the VE or the ALJ even recognized the possible conflict between the hypothetical" and the recommended job). Only after determining that there was work which Plaintiff could perform did the ALJ find Plaintiff not disabled.

As such, the court finds that the ALJ's ultimate determination that Plaintiff was not disabled is based on substantial evidence and consistent with the Regulations and case law.

## IV.
## CONCLUSION

For the reasons set forth above, the court finds that substantial evidence on the record as a whole supports the Commissioner's decision that Plaintiff is not disabled.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by Plaintiff in his Complaint and Brief in Support of Complaint is **DENIED**; Docs. 1, 17.

Dated this 28th day of September 2015.

/s/ Noelle C. Collins
UNITED STATES MAGISTRATE JUDGE